Filed 4/2/14  P. v. Kendricks CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. CHARLES DEANGELO KENDRICKS, Defendant and Appellant. | F062491 (Fresno Super. Ct. Nos. F09905956 & CF05908429) **OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  W. Kent Hamlin, Judge.

Cliff Gardner, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Stephen G. Herndon, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

On March 18, 2005, appellant/defendant Charles Deangelo Kendricks, a member of the East Lane Crips gang, was at a gas station in East Lane's territory when he

encountered three men from a rival gang. There were words exchanged and shots were fired. Defendant killed one man and seriously wounded another man. Defendant was arrested a few days later.

Defendant was released from custody and lived with his wife, Tiffany Carter (Tiffany), and her two young children.[1] Their relationship had been plagued by domestic violence, and he repeatedly threatened to harm and even kill her because he believed she was having relationships with other men. On November 1, 2005, Tiffany's body was found in their house. She had suffered a single fatal gunshot to the top of her head. Defendant was arrested a few days later and claimed Tiffany committed suicide. However, the pathologist testified it would have been almost impossible for Tiffany to inflict the fatal wound based on the angle and trajectory of the bullet.

Defendant was first tried for murder and attempted murder of his gang rivals at the gas station. His defense theory was that one of the victims fired first, that he fired back in self-defense, that it was a justifiable homicide, and that he was not guilty of any offense. Defendant was convicted of first degree murder (Pen. Code,[2] § 187, subd. (a)), attempted murder (§§ 664/187, subd. (a)), the substantive gang offense (§ 186.22, subd. (a)), and various special allegations. He was separately tried for the murder of his wife, and relied on the defense theory that Tiffany killed herself. He was convicted of second degree murder and assault with a firearm on Tiffany.

Defendant was sentenced to 100 years to life, plus 15 years 8 months for the murder and attempted murder at the gas station. He received a consecutive term of 55 years to life plus 2 years for the murder of his wife.

---

[1] Some of the parties will be referred to by their first names for the sake of clarity; no disrespect is intended.

[2] All further statutory citations are to the Penal Code unless otherwise indicated.

2.

Defendant filed separate notices of appeal from his two convictions. The cases have been consolidated. His appellate issues are primarily focused on his convictions in the gas station murder. As to that case, he contends the court's instructions on self-defense, justifiable homicide, accomplice testimony, and the consideration of Matthews's testimony were erroneous as a matter of law.

As to his wife's murder, he contends the court had a sua sponte duty to instruct the jury on voluntary manslaughter as a lesser included offense. As to both cases, he argues the court erroneously ordered two deputies in the courtroom to provide security.

In part I, we will address the facts relevant to defendant's convictions in the gas station murder. In part II, we will address the facts as to his conviction for murdering his wife. We affirm.

## PART I

### THE HOMICIDE AT THE CHEVRON STATION
### (Case No. CF05908429)

**Terrell, Matthews, and Small**

In March 2005, Anthony Terrell (Terrell) had a prior felony conviction for domestic violence. Terrell knew Darnell Small (Small) and O'Brian Matthews (Matthews). Terrell thought Matthews was a member of the Bloods.

On the evening of March 18, 2005, Terrell, Matthews, and Small drove to a friend's apartment on the east side of Fresno. They left their car there and walked to a nearby Chevron station and market at Butler and Chestnut. Matthews and Small were wearing red shirts.

When the men walked up to the station, defendant was already there and putting air in his car tires. Defendant was wearing a blue Dallas Cowboys jersey. Defendant was

3.

a member of the East Lane Street Crips.[3] There is no evidence defendant and the men knew each other.

As Small and Matthews walked into the store, Terrell noticed defendant was staring and giving them looks. Small looked back at defendant as if to ask what he was looking at. Terrell believed defendant was giving them a look as if to say, "I'm gonna come get you …."

Terrell testified that Matthews faced defendant, said a racial slur, and added, "This [is] West Roy," referring to Matthews's gang. Terrell knew they were on the east side. Small and Matthews went into the store. Defendant opened the driver's side door of his car. Terrell went into the store to warn Small and Matthews that defendant had opened his car door, and they should hurry and get out of there. Small looked mad, and Terrell thought something bad was going to happen.

Terrell testified he walked out of the store with Small and Matthews. Defendant was still at the gas station and seemed to be waiting for them. Defendant watched as they walked away from the gas station.

Terrell testified they headed to their friend's apartment across the street. Defendant followed them as they walked. Defendant said a racial epithet and added, " 'East Lane.' " Defendant told Matthews, " 'So now what you do?' " Matthews said, " 'It ain't even like that….' " Matthews cursed defendant. Defendant called Matthews and Small " 'slob asses,' " a derogatory term for Bloods. Terrell testified he believed defendant was showing disrespect to Matthews because he was "a young [B]lood."

---

[3] Defendant stipulated to his gang membership, and that his gang was a criminal street gang.

4.

**Defendant pulls the gun**

Terrell testified that defendant said: " 'I've got something for y'all.' " Matthews replied: " 'I'm not trying to do none of that. It's stupid.' " Defendant continued to follow them.

Terrell testified defendant put his hand inside his jersey, and he produced a Glock pistol. As defendant pulled the gun, Matthews again said, " 'It's not even like that.' "

Within two seconds, defendant fired more than three shots toward Matthews and Small. As defendant fired, Matthews and Small were looking towards defendant, and Matthews was saying, " '… It's not even like that. Don't even worry. It's not even like that. It's not even like that.' "

Terrell started to run away when he heard the gunshots. He ran back when he heard Small say, " 'I'm hit.' " Small fell down and he was spitting up blood. Terrell tried to help Small run toward the apartments, but Small fell down again. Matthews said he had been shot twice in the chest. Matthews took off his T-shirt and Terrell saw lots of blood. Terrell told a bystander to call the police. Defendant ran away down Chestnut.

**The initial investigation**

Detective Rafael Villalvazo arrived at the shooting scene within seconds of the dispatch. He saw Terrell kneeling over Small and Matthews, who were both lying on the ground and had gunshot wounds.

As Detective Villalvazo walked toward the victims, Terrell ran away and headed toward an apartment building. Villalvazo testified Terrell pulled a gun from his waistband and threw it away as he ran.

Terrell was taken into custody and escorted back to the shooting scene. As Terrell returned, Matthews said he had been shot. Terrell yelled out, " 'I shot those mother f\*\*kers back.' "[4] Terrell was arrested that night.

## The ballistics evidence

The officers found four expended .380-caliber cartridge casings at the shooting scene in the street.

The gun which Terrell discarded was found in a flower bed. It was a .44-caliber revolver and contained four live cartridges and one expended cartridge casing.

## The victims

Matthews and Small were taken to the hospital by ambulance. The police did not find them in possession of any firearms.

Small died that night from a single gunshot wound, which entered the front of his right chest, went through his lung and heart, and lodged in his back. He had been shot from a distance of 24 to 32 inches away.

Matthews was shot in the right lung, spent over a month in the hospital, and survived.

## Arrest of defendant

At 6:00 a.m. on March 23, 2005, Detective Andre Benson and other officers arrived at an apartment on Winery, where they believed defendant lived with his wife, Tiffany Carter (Tiffany).[5] The officers heard people inside the apartment, but they did not respond to the orders to open the door. After a standoff of several hours with a SWAT team and negotiators, defendant emerged from the apartment at 1:00 p.m. and was arrested. Tiffany was also in the apartment.

---

[4] At trial, Terrell testified he never saw Small or Matthews with a gun that night. Terrell insisted he did not have a gun, and he never fired a gun that night.

[5] As we will explain in part II, defendant was released from custody and later convicted of murdering Tiffany on November 1, 2005.

The officers found a .380-caliber bullet in the dryer's lint trap and a handgun shoulder holster in the washroom.[6]

## Defendant's postarrest contacts with Tiffany

Later on March 23, 2005, defendant called Tiffany from jail; the call was recorded and played for the jury. Tiffany told defendant that the police questioned her about a murder. Defendant said they did not have anything on him. Tiffany said she told the police that defendant was sitting in the car and nothing happened. Defendant said she should not have said that. Defendant told Tiffany she was not supposed to say he was there, but she had just put him there. Defendant reminded Tiffany that he told her what to say, when they talked about it before he came out of the house. Tiffany said the police already seemed to know he was at the gas station. Defendant said he was mad. He told Tiffany to say it was just a rumor he was there, and she was supposed to say he was not there at all. Defendant told Tiffany to call the "bad boys" and have them give a tip that "George Yancy" was involved in the gas station shooting.

## Terrell's pretrial statements

Detective Michele Ochoa interviewed Terrell twice about the homicide. Terrell said he saw a man, a woman, and a white car when he walked up to the Chevron store. Matthews exchanged words with the man.

Terrell said the man uttered racial epithets and said, " 'I got something for y'all.' " Matthews replied he wanted "none of that." The man again used racial language, swore at them, and said, "[Y]ou already did." Matthews apologized and said it was his fault. The man again swore at them.

---

[6] The police searched this same apartment on January 28, 2005. Tiffany was present. There were photographs of defendant everywhere in the apartment, and men's clothing in the master bedroom. The officers found a methamphetamine pipe, a bag of suspected marijuana, and 11 live rounds of 9-millimeter ammunition in the bedroom.

Terrell said they left the store and the man followed them. He kept " 'talking smack,' " but they ignored him. The man yelled, " 'Are you listening? Are you not listening to me? Huh?' " He then said, " 'Oh, y'all ain't paying no attention to me? This is East Lane, East Lane, East Lane, [w]hoop, [w]hoop.' " Terrell heard five or six shots. Small said he was hit and Terrell ran back to him.

During his second interview, Terrell told Detective Ochoa that Matthews argued with the man when they arrived at the Chevron store. The man replied, " 'This is East Lane. This is East Lane.' " Matthews put his hands in the air and said something like, " 'I don't want nothing from you.' " The man also cursed them and again said, " 'This is East Lane.' "

Terrell said they went into the store. The man reached into his car and appeared to put something in his waistband. The man walked up to the store's door, and he told them to " 'come outside, come see what I'm talking about ….' " He again cursed them, and said to come outside "so all you can see what I'm hauling …." Terrell said another man was standing nearby, talking on a cell phone.[7]

**Matthews's pretrial statements**

Detective Ochoa testified she interviewed Matthews while he was in the hospital, and he was not cooperative. Matthews said that when his group entered the store, a man told them, " 'This is East Side, whoop de whoop, if I catch you on East Side ….' " When they left the store, they were just trying to get away from the guy.

Matthews admitted he had a gun that night. Matthews said he fired it and then threw it away.

During a second interview at the police department, Matthews said the man made a comment about the east side when they arrived at the store. When they left the store, the man followed them across the street and said, " 'What about this?' " Matthews

---

[7] This man was later identified as Quincy Brown.

admitted he was carrying a .44 magnum in his pocket.  Matthews said he pushed down Small, started to turn around and pull his gun, raised his right arm, and he was shot. Matthews said he tried to shoot because he did not want the man to kill them.  Matthews thought he fired two or three times, and then threw away the gun.

**Quincy Brown's pretrial statements**

Quincy Brown, a friend of defendant, was at the gas station on the night of the homicide.  Detective Ochoa interviewed Brown before trial.[8]  Brown said defendant was at the gas station with his wife, Tiffany.  Brown saw three men walk up to the station. One man told defendant, " 'West up blood.' "  Defendant replied, " 'East up cuz.' "

Brown said the first man raised his shirt and showed a gun.  Defendant got mad and told Brown, " 'I'm gonna kill this one cause he showed me that gun.' "

Brown said the three men went into the store.  Defendant told Tiffany to leave. They argued, and Tiffany tried to get defendant to leave with her in the car.  She eventually agreed to leave.  Defendant cursed and told Brown to " 'watch this.' "

Brown said the three men walked out of the store.  Defendant said, " 'What's up, cuz, y'all talking that shit, what's up.' "  The three men kept walking.  Defendant crossed the street and followed them.  Brown followed defendant and said they should leave. Defendant cursed him and said, " 'F**k that country.' "

Brown said defendant followed the three men across the street.  One man started to turn and he said, " 'Man, I already told you, blood, I ain't gonna do no fighting.' "  As the man turned and made the statement, Brown heard one gunshot and saw defendant was

---

[8] Detective Ochoa testified the pretrial interview occurred because Brown had been taken into custody on a parole violation involving drugs, and he offered to talk about the Chevron shooting.  During the interview, Brown said his girlfriend did not have a record, she was not involved with the drug arrest, and he wanted to talk about the shooting so he could keep her out of the drug case.  At trial, Brown denied that he asked Detective Ochoa to help his girlfriend in exchange for information about the Chevron shooting.

firing a gun.  Brown believed defendant was within 10 feet of the men when he started to shoot.  One man fell down and said, " 'I'm hit.' "  Brown said one of the three men pulled his own gun, but it misfired, and it was aimed at the ground.  After defendant fired the shots, defendant said, " 'Don't be crying now .…' " to the victims.

**Quincy Brown's trial testimony**

At trial, Brown testified he grew up with defendant on Lane Street.  Brown had previously been a member of the East Lane Gang.[9]  He lived near the gas station.

Brown testified defendant had been at his apartment earlier on the evening of the shooting.  Brown had just been released from prison, and they talked about old times.  Defendant was carrying a gun.

Brown admitted he later walked to the gas station, which was five minutes away from his apartment.  He saw defendant and his wife, Tiffany, in their white car.  Brown briefly spoke with defendant.

Brown testified he stood outside the Chevron store and talked on his cell phone.  He saw three individuals walk across the street from an apartment building.  Two of the men were wearing red.  One of them said, " 'West up blood.' "  Defendant replied, " 'East up cuz.' "  Brown testified they used fighting words but nothing happened.

Brown testified he started to leave the area because he was afraid there would be a shooting.  Defendant was upset because he was being "hit up" by another gang in front of his wife.  Defendant told her to leave.  Brown saw one of the other men reach into his back, as if he was going to pull a gun.  Brown turned to leave, and he heard defendant ask, " 'Man, what you reaching for?' " referring to a gun.

At trial, Brown admitted he previously told an officer that when the three men went into the store, defendant was "all fidgety waiting for them to come out."  Brown

---

[9] Brown had a prior conviction for felony theft of a motor vehicle.

10.

also admitted that when the three men walked out of the store, defendant said, " 'What's up?' "

As the three men walked away from the store, defendant followed them across the street and said: " 'Wuzup?  Wuzup?' "  Brown told defendant, " 'Let's just go home, dog.' "  Defendant followed the three men and said, " 'F**k them country dudes.' "  Defendant said he was going to " 'get at' " them.

Brown testified defendant followed the three men across the street.  Brown followed defendant and repeatedly told him to go home.  One of the men told defendant, " 'Man, I already told you, blood I ain't gonna do no fighting.' "  The speaker was the first man who said, " 'West up.' "  Brown believed the man meant he was not going to fight or shoot.

Defendant replied, " 'F**k them country n*ggas.' "  One of the three men turned around and said, " 'What?' "  Brown thought one of the men reached behind his back, as if to pull a gun.  Brown never saw that man with a gun, but assumed he had one from his actions.  Brown walked behind defendant, again trying to get him to leave, and heard a gunshot.  Brown ran away and heard three or four more gunshots.  He also heard someone scream, and another person say, " 'Damn, dog, you got hit.' "

Brown ran back to his apartment.  Defendant called him 30 to 40 minutes after the shooting and asked Brown if he saw what happened.  Defendant said:  " 'They said, "West up," I said "East up."  They pulled a gun, started shooting.  I got one of them.  You see police down there?' "  Brown said he would walk back and look.  Defendant said, " 'Cuz, you see what I did?  I just shot that n*gga.' "  Defendant also said he did not know how it started.  Brown walked back to the scene and saw the police and the ambulance.

Brown testified defendant had a gun earlier that day, and he could have had one that night.  However, Brown did not recall telling the police that he saw defendant with a

gun at the gas station. Brown testified he did not see defendant get a gun from his car, pull a gun, stand in the street and point a gun, fire, or reload.[10]

## Matthews's trial testimony

Matthews was incarcerated when he testified at trial, and he pleaded guilty to a gang charge based on this incident. Matthews testified he lived on West Roy, in the west side, but claimed not to be affiliated with any gang.

Matthews testified Small was his best friend. Matthews claimed he could not remember much about the night of the shooting because he was drunk and high. He remembered that Small's friend, Terrell, walked with them to the store. Matthews admitted he had a gun in his waistband.

Matthews denied seeing defendant at the Chevron store, talking to anyone outside the store, or exchanging words with someone. After they left the store, Matthews heard more than one gunshot, and he pushed Small out of the way. Matthews pulled his gun; he was shot; and he blanked out. Matthews believed he fired his gun two or three times, but he could not remember. He also thought he threw away the gun after he fired. He did not think Small or his friend had a gun. Matthews testified he pulled his gun because he did not want the other guy to kill them.

Matthews testified he was charged with murder, a gang enhancement, and a gun charge as a result of the Chevron incident. He pleaded guilty to the gang charge "[j]ust to get out of jail."

Matthews testified he spoke to Detectives Ochoa and Byrd after the shooting, but claimed not to recall what he told them. Matthews claimed they threatened to lock him

---

[10] Investigator Benito Castellanos served a subpoena on Brown to testify at defendant's trial. When Brown arrived at the courthouse, he was apprehensive about testifying. As Castellanos escorted him to the courtroom, he saw family members of both the victims and defendant, and Brown hesitated to walk down the hallway. Castellanos kept Brown out of sight. During the second day of Brown's testimony, he was again apprehensive, and he became scared when three men entered the courtroom.

12.

up for 25 years because he did not identify the gunman, that they were happy because Small died, and that they said he also should have died because he was a gang member.[11] Matthews did not want to testify against defendant and said it was bad to be a snitch. Matthews admitted he got into a fight with defendant in a holding cell on the morning that he testified.

**Gang expert testimony**

Officer Ron Flowers testified as the prosecution's gang expert. He explained the East Lane Street Crips are a criminal street gang on the east side of Fresno, and claim the color blue. Their rivals are any groups beyond the east side, and any gang affiliated with the Bloods.

Officer Flowers testified the West Side Country Boys are based in southwest Fresno. They claim West Roy Street, the color red, and loyalty to the Bloods. If someone says, " 'West up blood,' " it means they are from the west side. The phrase " 'East up, cuz,' " means the speaker is a Crip who claims the east side. "Slob" is a derogatory word that a Crip would use to describe a Blood.

Officer Flowers testified Matthews and Small were active members of the West Roy Country Boys, and Terrell associated with members of the gang.[12] Defendant and Brown previously admitted their membership in the East Lane Street Crips, and they were active participants in that gang. The Chevron store was located inside East Lane's territory, and about three or four miles from the territory of the West Side Country Boys.

In response to a hypothetical question based on facts similar to the Chevron shooting, Officer Flowers believed the homicide was committed to further and promote the East Lane Street Crips, based on the blue and red colors worn by the participants, the

---

[11] Detective Ochoa testified the officers never threatened Matthews, never said they were glad Small died, and never said Matthews should have been the one to die.

[12] Officer Flowers testified Matthews was featured holding a sawed-off shotgun in "Fresno Unsensored," a movie about local gangs.

13.

words exchanged, and the location of the gas station within the East Side territory. Flowers testified that if one of the participants claimed his gang and initially showed a gun to the rival gang member, in front of the rival's family, that would mean the first man was looking for trouble. However, Flowers testified that if one group walked away, that indicated they were backing down from any confrontation.

**The charges and verdicts**

Defendant was charged with count I, murder of Small (§ 187, subd. (a)); count II, attempted murder of Matthews (§§ 664/187, subd. (a)); and count III, street terrorism (§ 186.22, subd. (a)).

As to counts I and II, it was alleged defendant personally used a firearm, and personally and intentionally discharged a firearm which proximately caused great bodily injury or death (§ 12022.53, subds. (b), (c), (d)).

It was further alleged he had one prior strike conviction (§ 667, subds. (b)-(i)); one prior serious felony enhancement (§ 667, subd. (a)); and served one prior prison term (§ 667.5, subd. (b)).

On October 26, 2009, defendant's jury trial began with the introduction of evidence. On November 3, 2009, defendant was convicted of count I, first degree murder of Small; count II, attempted murder of Matthews; and count III, active participation in a criminal street gang. All special allegations were found true.[13]

---

[13] Defendant was also charged and tried for count IV, second degree robbery (§ 211) of Charles Henry. He was found not guilty of this count. The charge was based on allegations defendant robbed, shot, and seriously wounded the elderly victim as he walked from the grocery store, near the corner of Winery and Lane Streets, on December 12, 2004. At the scene, Henry told the police he would not be able to identify the gunman. During an initial court appearance, Henry identified someone other than defendant as the gunman. At trial, Henry testified he was "almost positive" defendant was the gunman, but admitted he had already seen defendant at other court hearings. A woman who lived near the shooting scene testified defendant arrived at her apartment that morning and said he had shot someone.

14.

Defendant was sentenced to an aggregate term of 100 years to life, plus 15 years 8months as follows:  25 years to life, doubled to 50 years to life, for count I, plus 25 years for the firearm allegation; a consecutive term of 7 years, doubled to 14 years, for count II, plus 25 years for the firearm allegation; and a consecutive term of 8 months, doubled to 1 year 4 months, for count III.  The court stayed or dismissed the remaining allegations.

## PART II

### The Homicide of Tiffany Carter
### Case No. F09905956

In October 2005, defendant lived in a house on Recreation Avenue with his wife, Tiffany Carter, and Tiffany's children, S. and T.  Defendant and Tiffany had been together for about five years, and married for two years.  Tiffany was 27 years old, and the children attended school.

Vicky McGrue, Tiffany's mother, testified Tiffany worked at Jack-In-The-Box restaurant and earned a certificate from a nursing program.  McGrue testified Tiffany had never attempted suicide.  However, McGrue testified about an incident which occurred when Tiffany was 26 years old and she had taken some pills.  After the incident, Tiffany told her mother that "she had too much to live for with her kids."  Cylandra Kendricks, defendant's sister, testified Tiffany had been hospitalized for depression.

**Domestic violence**

S., Tiffany's daughter, was 12 years old in 2005; by the time of trial, S. was 17 years old.  S. testified they had lived in other places before moving into the house on Recreation Avenue.  S. initially liked defendant as her stepfather, but she changed her mind because defendant began to beat Tiffany.

S. testified defendant and Tiffany often argued.  S. saw defendant physically beat Tiffany four or five times.  Tiffany would have marks and injuries after defendant hit her.  On one occasion, defendant threw a chair at Tiffany, and she had to get stitches above her eyes.  When they lived in the Recreation Avenue house, defendant once accused Tiffany

15.

of being with another man. S. testified that defendant accused Tiffany of cheating and said: "If you cheated on me I'll kill you."

**The October 21, 2005, incident**

Around 12:45 a.m. on October 21, 2005, Detective Neal Cooney responded to defendant's residence and contacted defendant and Tiffany. Tiffany was crying, upset, and emotional. Defendant said he became mad because the phone would ring, he would answer, the caller would hang up, and he believed Tiffany was being unfaithful.

**The incident on Halloween**

S. extensively testified about the events of October 31, 2005 (Halloween), the day before Tiffany was killed. S. testified she walked home from school with her brother that afternoon. When they got home, defendant and Tiffany were arguing and yelling in their bedroom, and the door was closed.

After about 30 minutes, S. knocked on the bedroom door because she wanted to get Tiffany out of there. Defendant opened the door, and S. saw Tiffany crying on the bedroom floor. S. also saw a black gun on the bed. S. asked defendant "if I could have my mom." Defendant said they were talking, and he closed the door.

S. testified her brother started to have an earache, and he wanted Tiffany to get his medicine. S. could still hear defendant and Tiffany in the bedroom, and Tiffany was crying. S. again knocked on the closed door. Defendant opened it and asked what she wanted. Tiffany was still on the floor. S. asked defendant if "we could have our mom" because her brother had an earache and needed medicine. S. testified that defendant "let [Tiffany] get up and get the medicine…."

S. testified Tiffany walked out of the bedroom, went into the kitchen, and got the medicine. Defendant stayed in the bedroom. Tiffany put drops in the child's ear, and then she went back into the bedroom. S. grabbed Tiffany's hand and tried to stop her from going back into the bedroom because she did not want to hear them argue. Tiffany went into the bedroom, and S. let go of her hand.

16.

S. testified she again asked defendant for her mother. Defendant "thumped" S.'s forehead and told her to go back into the living room. S. testified defendant "thumped" her forehead a second time, but she could not remember when the other incident happened. S. was mad, and she went into the front yard and slammed the house door. Defendant "came after me" and asked where she was going. S. said she was going to call the police. Defendant asked why. S. said it was because "you won't give me my mom." Defendant said, "I give you her when I'm done talking to her." S. testified defendant raised his voice and "said it with attitude because he was already mad."

S. and defendant went back into the house. Defendant went into the bedroom and closed the door. S. testified it was silent for a long time, and she did not hear any more arguments that night.[14]

**Discovery of Tiffany's body**

Yesenia Esparza lived next to defendant and Tiffany, but she did not know them. Around 11:00 a.m. on November 1, 2005, Esparza was in her backyard and heard the voices of a man and woman from defendant's house. Both people were yelling, screaming, and arguing, but she could not hear what they were arguing about. She went back into her house and could not hear anything more.

Around 12:00 noon on November 1, 2005, members of defendant's family arrived at defendant's house and found Tiffany's body on the bedroom floor, having been shot in the head.[15]

---

[14] At trial, S. testified that she was interviewed by the police on the night of the homicide, and she was not completely truthful during that interview because she was mad that her mother was dead, and she wanted defendant to get in trouble. S. testified she falsely told the police that on Halloween night, she went inside the bedroom to get Tiffany out of there, that she saw defendant point the gun at Tiffany, and that defendant threatened S. if she called the police. S. testified the rest of her statement to the police about the Halloween night incident was correct. S. explained she was now 17 years old, and she was telling the truth because she was old enough to "know how important this is."

17.

Around 1:00 p.m., the police and emergency personnel responded to defendant's house. Tiffany's body was lying face-up on the bedroom floor. She had suffered a single gunshot wound to the top of her head, and there was a pool of blood under her head. There were blood spatters on both the ceiling and a ceiling fan directly above her body.

## Initial investigation

The police found a black plastic replica handgun in the house; it was not an operable firearm. The replica handgun was on the bedroom floor, on top of bloodstained white socks. An expended cartridge casing was on the floor between Tiffany's left hand and the bed. There were copper bullet fragments on the floor by the nightstand. There was blood on the edge of the bed.

The criminalist determined the cartridge case found in the bedroom was a .45-caliber with an RP head stamp. The copper jacket and lead core fragments were consistent with a .45-caliber bullet. Based on the grooves and marks, the criminalist testified the bullet and cartridge case were fired from the same weapon, which was a .45-caliber high point semiautomatic pistol with an ejection port.

The police never recovered a firearm to match the bullet and casing, and the weapon used to fire the fatal gunshot into Tiffany's head was never found.

## Defendant's sisters

Detective Byrd interviewed Cylandra Kendricks (Cylandra), defendant's sister, a few hours after Tiffany's body was found. Cylandra said she was at defendant's house on October 31, 2005, Halloween night, so their children could go trick-or-treating.[16] Defendant asked her to come back the next day around 12:00 noon.

[15] As we will explain *post*, various members of defendant's family gave various reasons about why they were at the house that day and how they found Tiffany's body.

[16] S., Tiffany's daughter, testified no one came over to their house on Halloween night.

Cylandra told Detective Byrd she arrived at the house around 11:45 a.m. on November 1, 2005. Defendant was standing outside by the garage. He was waving his arms at her, and said, " 'Over here, over here.' " Cylandra pulled into the driveway in front of the garage. The garage door was open. Cylandra said defendant was holding a basket of clothing, and he put it in her car. Defendant went back into the house, and came out with more clothing. Cylandra asked defendant about Tiffany, and defendant said she was inside.

Cylandra said defendant got into the car and asked her to drive to an apartment building. Cylandra said that during the drive, there were tears in defendant's eyes, and he appeared to be very upset. When they arrived at the apartment, a man was waiting for him and helped defendant carrying the clothing inside.

At trial, Cylandra testified to a slightly different story, and said she was supposed to pick up defendant and Tiffany on November 1, 2005, so they could run errands, but she did not remember when they had made those arrangements. When she arrived at the house, defendant was waiting outside, and Tiffany was not there. Defendant got into the car with the laundry basket. She did not ask about the laundry basket or Tiffany's whereabouts. Cylandra testified defendant was crying, upset, and mad as she drove him around, and he was banging on the car's dashboard. She asked what was wrong, but he did not reply.

Cylandra testified defendant asked her to drive to a liquor store. He got out and used a pay phone, and then told Cylandra to drive to an apartment on Church. When they arrived at the apartment, two men were waiting for defendant. Defendant spoke to them, then retrieved the laundry basket and left.

Angela Kendricks (Angela), another sister of defendant, was interviewed several hours after Tiffany's body was found. She told the police that she received a telephone call from her sister, April, earlier that day. April said something had happened, but she was not specific. Angela said she called her father and told him about what April said.

19.

Angela drove to defendant's house. When she arrived, her father was in the yard. Angela went into the house and found Tiffany's body on the bedroom floor. April was sitting next to the body and crying. A blanket was wrapped around the body.

At trial, however, Angela testified she could not remember why she went to defendant's house that day. The door was unlocked; she went in and found Tiffany lying on the bedroom floor. Angela called 911 and members of her family. Angela testified she did not remember getting any telephone calls that triggered her visit to defendant's house, she did not know if any family members were already there, and she could not recall what she previously told the police.

**The fatal wound**

The pathologist testified Tiffany died from a single gunshot wound to the head, and her death was a homicide and not a suicide. The entrance wound was on the top of Tiffany's head, just to the right of midline. It was a contact wound because there were fractures and lacerations at the entrance wound site, and there was powder all around and inside the wound. The bullet traveled from the top of her head, down about three inches. There was an exit wound on the right back portion of the head, about two inches to the right of midline.

The pathologist testified the front edge of the entrance wound was curved, which indicated the bullet traveled from front to back. The bullet went through the scalp and brain at a very sharp downward angle, top to bottom, and exited through the right occipital scalp. The entrance and exit wounds were separated by three inches.

The pathologist testified the shot was fired after "firm placement of the gun directly on top of the head," which delivered quite a bit of gun powder to the skin and the outside of the skull at the entrance wound site. The pathologist tried to demonstrate how difficult it would be to self-inflict such a wound at that angle because the firearm would have to be in somewhat of an odd position, which meant "it would be hard for me to do it on myself …. The gun has to be angled, where the end of the barrel not only creates the

20.

round portion … on the top of my head, but … once it's fired, it passes back towards the back portion of her head … to deliver enough gun powder and force .…"

The pathologist explained why Tiffany did not commit suicide:

> "Considering not only the location of the wound on the head as far as the entrance and exit, but the characteristics of the entrance wound and the nature of having a hard contact entrance gunshot wound, which would require a very difficult position for a person – *I would say almost impossible position for a person, to place the weapon and create this entrance gunshot wound*."  (Italics added.)

The pathologist demonstrated why it was almost impossible to position the gun at an angle, on top of the head, and still keep the weapon in very solid and hard contact with the top of the head.

The pathologist further explained the blood spatters on the ceiling and ceiling fan above Tiffany's body could have resulted from "blow back," which occurs when the barrel of a weapon is placed against a surface and fired, and "soft tissue, blood, and other items come back towards the barrel of the weapon.  [O]nce the barrel is on the surface, or once the bullet is fired, you may have it directly towards the barrel end or you may have it to the side or straight up … it's the phenomenon of tissue and blood coming back towards the barrel end."  The pathologist would have expected blow back from Tiffany's head wound based on the hard contact gunshot to the top of her head, so that "tissue and blood [would be] coming back off that skin surface and depositing in different locations." There was no blood on Tiffany's hands.

The pathologist testified his opinion about a homicide would not change if he learned Tiffany left behind suicide notes.  "Again, it really depends upon the nature of the wound itself.  Wounds could be consistent with a suicide or not consistent with a suicide. This wound appeared not consistent with a suicide, whether you have a suicide note or not."

### *The bruises and abrasions*

The pathologist also concluded Tiffany's death was a homicide based on the multiple bruises, abrasions and blunt traumas on her body. There were bruises on both the right and left sides of her neck, similar to those which are found in attempted strangulations, and bruises on her nose, face, chest, and on both forearms and upper arms. A horizontal linear abrasion ran from the front to the back of the right side of her neck. An apparent bite mark was on her left bicep. There were injuries to her right hand and forearm, a bruise on her left wrist, and a noticeable bruise on the palm side of her left hand. There were two parallel bruises on her arms that were likely from fingers applying pressure.

There was a large bruise on the outside of Tiffany's left thigh, which went past her knee to the lower leg, and was about 22 inches long. There were 15 abrasions within that bruise. There were more bruises on the right leg; the left thigh, which continued down the outside of her leg; the inner portions of both legs; and deep bruises on the right calf. There was an older bruise on the back of her left shoulder. The abrasions and bruises were not likely suffered from a fall.

There was a large amount of methamphetamine in Tiffany's system, possibly consistent with being a heavy user.

## Arrest of defendant

On November 4, 2005, Detective Benson and other officers were looking for defendant at a motel near Highway 99 and Belmont. The officers saw defendant walk and then run away from the motel. Benson chased defendant in his patrol car. He drove alongside of defendant and ordered him to stop. Defendant refused to stop and ran away at a full sprint. Defendant ran to another motel and jumped a fence. Benson drove to the back of the motel to cut him off. Benson got out of his patrol car, pulled his firearm, and confronted defendant as he was about to jump another fence. Benson ordered defendant to stop. Defendant turned from the fence and ran back into the motel property.

Detective Benson jumped the fence and chased defendant through the motel area. Benson confronted defendant in front of a glass-wall pool house, raised his gun, and ordered him to get on the ground and surrender. Defendant remained standing, and they stared at each other. Defendant started to move his hand toward his waistband. Benson placed his finger on the trigger and ordered him to get down.

Detective Benson testified defendant did not pull a weapon. Instead, his baggy pants were falling down from his exertions. Defendant pulled up his pants, and then intentionally ran through a plate glass window, which led into the pool house area. Benson was stunned as the glass shattered around him. Defendant ran into the pool house and looked for a way out. Benson followed defendant through the broken window, kept him at gunpoint, and repeatedly ordered him to surrender.

Defendant ran to another plate glass window and tried to crash through it. He threw his body against the window three or four times but he could not break the glass.

Defendant finally surrendered. His hands and arms were covered with blood. Detective Benson testified defendant's hands and arms were not bleeding when they confronted each other during the pursuit, before defendant crashed through the glass.

As Detective Benson took defendant into custody, defendant said, "Benson you got me," and that he did not mean to run, but "he knew that this was in regards to his wife, and he wanted to tell me what happened." Benson said other detectives would speak to him.

Defendant had a room key in his pocket, from the motel where he was initially observed. The motel room was searched, and the police found a pair of jeans with a red smear, a bandage in the trash which appeared to have blood on it, and a pillow with a possible droplet of blood.

**Defendant's pretrial statements**

Later on November 4, 2005, Detectives Byrd and Ochoa interviewed defendant at the police station.

23.

Defendant said he loved Tiffany, that he did not kill her, and that he could not live without her. However, he was upset because she messed around with someone who had inflicted bruises and scratches on her, and she regularly received secret calls from other men. Defendant told Tiffany he was going to leave her, and Tiffany got the gun out of the bedroom drawer. Defendant said the gun did not belong to him, and one of Tiffany's friends had left the gun with her.

Defendant said he took the gun away from Tiffany and put it in the garage. Defendant told Tiffany to confess what she was doing. Defendant said he was more hurt than angry. Defendant said she wrote letters to him and her mother and put them in the kitchen. Defendant went back to bed. Tiffany left the bedroom and then returned. Defendant heard a gunshot, and Tiffany fell down. He realized she was dead.

Defendant said he called his sister, Cylandra, and told her that Tiffany had killed herself. Cylandra came over, and he told her that Tiffany was dead. Defendant took the gun and some clothes, and he left with Cylandra. She drove him to a friend's house, and defendant gave the gun to the friend. However, defendant also said he left the gun in the motel room.

Defendant repeatedly said he loved Tiffany; he never would have hurt her; she killed herself; and he could not live without her. Defendant said Tiffany had taken pills before, and other people thought she was suicidal. Defendant thought she slept with other men when he was away from the house. Defendant said he "joked" that he would kill her if he caught her fooling around. Defendant insisted he never could hurt her.

Defendant wanted to know how long he was going to have to talk to the officers because he wanted to get it over fast. Defendant refused to identify who had the gun because he did not want to get someone else in trouble.

After listening to defendant's story, Detective Byrd told defendant that he believed he shot Tiffany by accident, and told defendant what Tiffany's daughter revealed about

24.

their prior fights. Defendant said that was not true, Tiffany's daughter was lying, and he never threatened to kill Tiffany.

Detective Byrd told defendant that Tiffany's body was covered with bruises. Defendant said he saw the bruises on her body but insisted he never touched her. Defendant said they had sex on the same day she killed herself, and he believed she had just had sex with another man.

Detective Byrd told defendant they were having problems with his entire story, because the autopsy revealed that Tiffany did not shoot herself. Byrd speculated that defendant was mad at Tiffany, and he accidentally fired the gun. Byrd also said they could not find the gun in the motel room. Defendant became angry, cursed Byrd, said he did not shoot her, and that he was going to leave her, and she killed herself.

On November 6, 2005, Detective Byrd conducted another interview with defendant. Byrd asked defendant what happened just before Tiffany was shot. Defendant said they had sex, and then he asked Tiffany about fooling around with other men. Defendant said he was not mad but asked her to tell the truth. Tiffany was crying and upset. Defendant again claimed Tiffany shot herself.

Detective Byrd told defendant they had letters which described defendant's prior physical abuse of Tiffany, and his repeated threats to kill her. Defendant said he was joking that he would kill her if she fooled around while he was away from her. Byrd said that defendant described himself as jealous and violent in the letters. Defendant said that was wrong, and he was not jealous of Tiffany. Defendant said he was going to leave Tiffany because she would not tell him the truth, and that's why she killed herself.

**Defendant's letters to Tiffany**

When the police searched the house after finding Tiffany's body, they found numerous boxes of letters and paperwork. These included a series of letters that defendant wrote to Tiffany in April, May, and June 2005, and these letters were read to the jury.

In these letters, defendant repeatedly told Tiffany that he loved her, that he would not hit her anymore if she did not yell at him, and she needed to be good and not "f\*\*k me over, and you're my MF wifey till death do us part!" He said that violence was in his blood; he only hit her in public once and did what was needed when he slapped her; and she shouldn't yell at him because it would always result the same way, and she knew how he would react. Defendant said he did not slap other people because they did not yell at him; she did not love him as much as she used to; he did not trust her; she was withholding information from him about some "dude on the phone"; and he would "go to the grave with that."

In another series of letters, defendant warned Tiffany not to let any "dudes" visit the house; to stop "letting dudes lie and f\*\*k you in front of my kids" because she was making him mad; and he would pay her back "for doing me wrong." He warned Tiffany that she had to talk correctly to him, because "[t]hat's how you got those stitches. Your mouth, watch how you talk to me.… I'm not going to take your mouthing off. I know you were getting down with one or two dudes while I was gone cause you are a ho like that, and that's what hoes do…," and he was "gonna drown you in the pool big time[,]" if he found out that other men visited the house.

On May 11, 2005, defendant wrote to Tiffany that he would beat her if he found out that "Daniel" had been in the house; she was very sneaky; and she would be "like (Lacey Peterson)" because "I don't care about going to jail,… I'll go on the run first until they catch me, so don't tempt me or go there. That's a promise.… I don't care if you're scared of dying or not cause that will make my job easier.…"[17]

---

[17] The jury was informed that Lacey Peterson's husband was convicted of murdering her and her unborn child.

**Tiffany's letters to defendant**

The police also found a series of letters from Tiffany to defendant. In some undated letters, Tiffany wrote that she was going to divorce him because he beat her. She said she was filling out the divorce papers and changing the locks, that she was moving on with her life, and she could never trust him again. "But before I divorce you and you kill me, I want you to really understand why I divorced you[,]" because of the physical abuse. Defendant did not have the power to make her stay, and he would be doing her "a favor by killing me because if staying with you is what I have to do in order to live, that's fine, I'm not scared.… But you having me as your wife is not going to happen, and I'm willing to die for what I want."

In a letter dated October 19, 2005, just weeks before her death, Tiffany wrote to defendant that she did not have anything to confess, that he was driving himself crazy to think she was cheating on him. She said he did not appreciate her love and asked why he didn't find someone else, if she made him so unhappy. She indicated that their marriage was over, that he was wrong to treat her the way he did, and that she wanted a divorce. Tiffany also wrote that she was scared to do anything around him, that she loved him, and "if I got to die to show you that, then that's what I'm willing to do.… I'm waiting for the day that we want to be in each other's presence to run far away from you as possible, so you better go ahead and kill me now…."

**Tiffany's letter in the kitchen**

The police found an emergency protective order in the kitchen. They also found a letter on the kitchen table, which Tiffany had addressed to defendant. It was dated November 1, 2005, the date that Tiffany's body was found, and was the basis for defendant's claim that Tiffany committed suicide.

> "Babe I want you to know that I love you so much with all my heart. I wish there was something I could do to prove to you that I'm not sleeping with … [several men].… I wouldn't do that to you, babe, and I know I'm not lying to you. And I'm scared because I don't want to die behind this.

27.

I'm not understanding why you won't let me call him and leave a message cause I'm not f\*\*king with him. He's going to call back. Plus I'm digging a deeper hole for myself, right? … I'm begging you from the bottom of my heart, give me just one chance to show you I'm not lying. Please. I mean, I'm going to die regardless, but I want you to honestly believe me on these things. Please, I'm begging you. And if I fail, which I won't, *then I'll make your job easier by doing it myself cause it really hurts me to know that you think I would betray you with one of your homeboys like that.…* So let me prove that to you, and if you don't have a change of heart afterwards, I swear to God I'll leave you and the world. Please, I need you to give me that. Please. You won't have to ask any more questions at all. All you got to say is, 'I don't believe you Tiffany,' and I swear on my kids' heartbeat, your mom and my mom, I'll kiss you one last time, tell you I love you, and do the damn thing. I swear to God. But I need you to promise me that you won't do it and you'll let me. I don't want you to do that to me. I love you too much and I know you love me, and you'll be having second thoughts and scaring me even more. And I won't hesitate. I swear I won't, cause I'm telling you the truth right now and you ain't trying to hear me at all and it hurts so much.… I need you to believe me more than ever right now.… We can do it your way or my way cause either way I'm telling you the truth .… You told me you didn't want to hear me say I'm telling the truth cause God is my witness. I'm not lying to you .… I need you so much right now to give me one chance to prove I'm not lying .… But if you don't, my offer still stands, and I'll handle that.… I don't want to be without you, but I also don't want you to join me in death.… Don't do that to your kids and your mom.… But me on the other hand, if I don't' prove my case to you, I don't need to breathe again.…" (Italics added.)

Tiffany also wrote that if defendant did not believe her, to just leave the gun "in the middle of the bed loaded and ready to go, give me about five seconds to say I love you, and I swear to God I'll do it, and I won't be scared this way…." She asked defendant to make sure the children were not there "when it go down … [c]ause if we're both in the room together, *the first thing they're going to think is you killed me*, and I won't be able to tell them the truth, so please don't let them be anywhere in the house .…" Tiffany asked defendant to promise not to kill himself, and that everyone knew she had tried to kill herself before over him. (Italics added.)

28.

**Tiffany's letter on the refrigerator**

The police also found a letter on the refrigerator that Tiffany had addressed to her mother. It was time-dated 1:57 a.m. on November 1, 2005.

Tiffany wrote to her mother that she was sorry it had to happen this way, and to let everyone know she loved them. She asked her mother to take care of the children, keep them together, and let them know that she was sorry. Tiffany wrote that she was tired and nothing was going her way. "I'm to the end of my rope, but I had to do this in order to be at ease, and don't blame anybody but myself. *My husband tried to stop me and I didn't let him*…." She left the money in her purse to her mother, and said she would miss her. (Italics added.)

## DEFENSE EVIDENCE

Dr. Harry James Bonnell, a forensic pathologist, testified that Tiffany's fatal head wound could have been accidentally or intentionally self-inflicted. He conceded the entrance wound was "an atypical place" for a self-inflicted gunshot. He disputed the pathologist's testimony about blow back and blood spatter, and noted no forensic tests were conducted on the red marks found on the ceiling to confirm the presence of blood. Based on the toxicology report, he believed Tiffany was coming down from a methamphetamine high, and her level of intoxication could still have affected her thinking and conduct. He could not differentiate whether her death was a homicide, suicide, or accident.

Dr. Bonnell disputed the pathologist's testimony about Tiffany's bruises and believed they were older injuries, and she did not suffer a bite mark. However, he conceded the older bruises indicated Tiffany had been engaged in fights or had been beaten by someone.

A forensic examination revealed the presence of gunshot residue on Tiffany's right and left hands. The residue indicated she either fired a firearm, that she was close to

a firearm as it discharged, or that she handled a firearm or other surface contaminated with gunshot residue particles.

**Additional letters**

The defense introduced letters that Tiffany wrote to defendant in October 2003, where she said she might kill herself if he closed the door on her, that she tried to do the right thing, but defendant was giving up on her, and that she did not know what she was living for.

In March 2005, Tiffany wrote a letter addressed "[t]o whom it may concern," that she considered herself mentally ill; she couldn't help what she was doing; she did not think the outcome was going to be very nice; she loved her children; she wanted her mother to have custody of her children; and she did not know what she was going to do, but she was going to get a lot of attention from everyone. Tiffany wrote that she could not be a victim any more, and to "look for me in prison, heaven, or hell."

**The charges and verdicts**

Defendant was charged with count I, murder of Tiffany (§ 187, subd. (a)), with the special allegation that he personally and intentionally discharged a firearm, which proximately caused great bodily injury or death (§ 12022.53, subd. (d)); count II, assault with a firearm on Tiffany, committed on October 31, 2005 (§ 245, subd. (a)(2)); count III, criminal threats to S. (Tiffany's daughter) on October 31, 2005 (§ 422); and count V, possession of a firearm by a felon (§ 12021, subd. (a)(1)). It was further alleged defendant had one prior strike conviction, one prior serious felony conviction, and one prior prison term enhancement.

On July 20, 2010, defendant pleaded no contest to count V and admitted the prior conviction allegations. Thereafter, defendant's jury trial began for the murder of Tiffany. On July 26, 2010, the court granted defendant's motion for a mistrial.

On February 7, 2011, defendant's retrial began for the murder of Tiffany. On February 18, 2011, defendant was convicted of count I, second degree murder of Tiffany,

and count II, assault with a firearm on Tiffany; the special allegations were found true. The jury was unable to reach a verdict on count III, criminal threats against S., and the court declared a mistrial on that charge.

Defendant was sentenced to an aggregate term of 55 years to life plus 2 years, as follows:  15 years to life, doubled to 30 years to life, for count I, plus 25 years for the firearm allegation; and a consecutive term of 1 year, doubled to 2 years, for count II.  The court ordered the other terms concurrent or stayed.  The court ordered the sentence for the murder of Tiffany to run consecutively to the terms imposed for the gas station murder and attempted murder.

**DISCUSSION**

## I.  The jury was properly instructed on self-defense

As to the homicide of Small, the court instructed the jury on first and second degree murder; perfect self-defense; justifiable homicide; imperfect self-defense; and manslaughter.  Defendant was convicted of first degree murder.

Defendant contends CALCRIM No. 505, the pattern instruction that the court gave on perfect self-defense and justifiable homicide, was incorrect as a matter of law because it conflicted with the statutory definition of self-defense contained in section 197, subdivision 1.  Defendant argues this statutory definition permits a person to rely on perfect self-defense simply "where the evidence shows the decedent has committed a crime" and does not require any showing of reasonableness as required by other portions of sections 197 and 198.

Defendant argues the purported instructional error violated his due process rights and requires reversal of his murder conviction.  As we will explain, however, the jury was correctly instructed, and defendant's instructional arguments are meritless.

31.

**A. <u>Self-defense and justifiable homicide</u>**

In order to address defendant's instructional arguments, we must first review the principles of self-defense and justifiable homicide as set forth by the California Supreme Court.

"A killing committed in perfect self-defense is neither murder nor manslaughter; it is justifiable homicide. [Citations.]" (*People v. Randle* (2005) 35 Cal.4th 987, 994 (*Randle*), overruled on other grounds in *People v. Chun* (2009) 45 Cal.4th 1172, 1201.) "For killing to be in self-defense, the defendant must *actually and reasonably* believe in the need to defend. [Citation.] If the belief subjectively exists but is objectively unreasonable, there is 'imperfect self-defense,' i.e., 'the defendant is deemed to have acted without malice and cannot be convicted of murder,' but can be convicted of manslaughter. [Citation.] To constitute 'perfect self-defense,' i.e., to exonerate the person completely, the belief must also be *objectively reasonable*.... [F]or either perfect or imperfect self-defense, the fear must be of imminent harm. 'Fear of future harm – no matter how great the fear and no matter how great the likelihood of the harm – will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury.' [Citation.]" (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082, fn. omitted, italics added.)

"The principles of self-defense are founded in the doctrine of necessity. This foundation gives rise to two closely related rules which are applicable in this case. First, only that force which is necessary to repel an attack may be used in self-defense; force which exceeds the necessity is not justified. [Citation.] Second, deadly force or force likely to cause great bodily injury may be used only to repel an attack which is in itself deadly or likely to cause great bodily injury; thus '[a] misdemeanor assault must be suffered without the privilege of retaliating with deadly force.' [Citations.] Under these two principles a person may be found guilty of unlawful homicide even where the evidence establishes the right of self-defense if the jury finds that the nature of the attack

did not justify the resort to deadly force or that the force used exceeded that which was *reasonably necessary* to repel the attack. [Citations.]" (*People v. Clark* (1982) 130 Cal.App.3d 371, 380, italics added, disapproved on other grounds in *People v. Blakeley* (2000) 23 Cal.4th 82, 92.)

"[A]ny right of self-defense is limited to the use of such force as is *reasonable* under the circumstances," (*People v. Pinholster* (1992) 1 Cal.4th 865, 966, italics added, citations omitted) and "[t]he right of self-defense [does] not provide defendant with any justification or excuse for using deadly force to repel a nonlethal attack. [Citation.]" (*Ibid.*, disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 458–459.) "[T]he ordinary self-defense doctrine – applicable when a defendant *reasonably* believes that his safety is endangered – may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. [Citation.]" (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1, italics added.)

## B. Sections 197 and 198

Defendant's instructional arguments are based on sections 197 and 198, which define justifiable homicide and perfect self-defense. We will briefly review these statutes, and then examine the pattern instructions which are based on these provisions.

Section 197 defines justifiable homicide and is divided into four subdivisions. It states:

> "Homicide is … justifiable when committed by any person in any of the following cases:

> "1. *When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person*; or,

> "2. When committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends and endeavors, in a

33.

violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein; or,

"3. When committed in the lawful defense of such person, or of a wife or husband, parent, child, master, mistress, or servant of such person, when there is *reasonable ground* to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished; but such person, or the person in whose behalf the defense was made, if he was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed; or,

"4. When necessarily committed in attempting, by lawful ways and means, to apprehend any person for any felony committed, or in lawfully suppressing any riot, or in lawfully keeping and preserving the peace." (Italics added.)

As we will explain *post*, defendant asserts his perfect self-defense theory in this case was based on section 197, subdivision 1.

Section 198 further addresses justifiable homicide by reference to portions of section 197:

"A bare fear of the commission of any of the offenses mentioned in *subdivisions 2 and 3 of Section 197*, to prevent which homicide may be lawfully committed, is not sufficient to justify it. But the circumstances must be sufficient to excite the fears of a *reasonable person*, and the party killing must have acted under the influence of such fears alone." (Italics added.)

## C. **Defendant's arguments and the instructions**

Based on this background, defendant asserts that section 197, subdivision 1 defines a perfect self-defense/justifiable homicide theory distinct from those defined in section 197, subdivisions 2 and 3. Defendant argues that only the self-defense theories defined in section 197, subdivisions 2 and 3, contain a reasonableness standard, based on the express definitional language of section 198.

Defendant further asserts he relied on the self-defense theory defined in section 197, subdivision 1, and that theory does not require the same reasonableness "limit" as

34.

required for the self-defense theories defined in section 197, subdivisions 2 and 3, and section 198.

The court instructed the jury in this case with CALCRIM No. 505, the pattern instruction on perfect self-defense and justifiable homicide. Defendant asserts this instruction was erroneous because it included the reasonableness "limit" which, he contends, is only applicable to the perfect self-defense theories defined in section 197, subdivisions 2 and 3, but inapplicable to the self-defense theory he relied on, as defined in section 197, subdivision 1.

As given in this case, CALCRIM No. 505 stated:

"The defendant is not guilty of murder, manslaughter, attempted murder, or attempted manslaughter if he was justified in killing or attempting to kill someone in self-defense or defense of another. The defendant acted in lawful self-defense or defense of another if:

"1. The defendant *reasonably believed* that he or someone else was in imminent danger of being killed or suffering great bodily injury;

"2. The defendant *reasonably believed* that the immediate use of deadly force was necessary to defend against that danger; and

"3. The defendant used no more force than was *reasonably necessary* to defend against that danger.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of great bodily injury to himself or someone else. Defendant's belief must have been *reasonable* and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that *a reasonable person* would believe is necessary in the same situation. If the defendant used more force than was reasonable, the killing or attempted killing was not justified.

"When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider *what a reasonable person* in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

35.

"The defendant's belief that he or someone else was threatened may be reasonable even if he relied on information that was not true. However, the defendant must actually and reasonably have believed that the information was true…." (Italics added.)

Defendant cites to the italicized language of CALCRIM No. 505 and asserts the instruction was incorrectly based on the "reasonableness" theory of self-defense defined in section 197, subdivision 3, and section 198. Defendant argues the "reasonableness" limitations misstated the legal basis for the self-defense theory which he relied on at trial, as stated in section 197, subdivision 1.

**D. Analysis**

Defendant acknowledges the authorities cited above, which require a reasonableness standard for perfect self-defense, but argues those cases address the self-defense theories defined by section 197, subdivisions 2 and 3. Defendant asserts that "… for over 140 years the law has been clear: when the evidence indicates that the defendant was afraid a crime was about to occur, the law insists that the defendant's fear be reasonable and that he act solely based on that fear. In contrast, when the evidence indicates that a defendant acted in self-defense while resisting an attempt to kill or cause great bodily injury, *that is the end of the inquiry; there is no further limit on the right to use self-defense*." (Italics added.) Defendant contends section 197, subdivision 1 is the basis for this latter theory, that he relied on this defense theory in his case, and that the inclusion of the reasonableness language in CALCRIM No. 505 was erroneous as a matter of law. Defendant's arguments are meritless.

Section 197, subdivision 1 provides that a homicide is justifiable if committed "[w]hen resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person." While section 197, subdivision 1 does not expressly contain any reasonableness requirement, it is well recognized that the provision is a codification of a common law defense. (*People v. Ceballos* (1974) 12 Cal.3d 470, 477–478 (*Ceballos*); *People v. Jones* (1961) 191 Cal.App.2d 478, 481 (*Jones*).) Where

statutes are merely codifications of the common law, they are assumed to be limited by the corresponding traditional common law rules. (*Parsley v. Superior Court* (1973) 9 Cal.3d 934, 938-939.) Virtually all forms of the common law doctrine of justification contain a reasonableness element. (*People v. Uriarte* (1990) 223 Cal.App.3d 192, 197 (*Uriarte*). Therefore, it follows that a reasonableness standard is also implied in the statutory version of the defense.

> "*Jones* read into section 197, subdivision 1, the limitation that the felony be ' "some atrocious crime attempted to be committed by force.' " *Jones* … further stated, 'The punishment provided by a statute is not necessarily an adequate test as to whether life may be taken for in some situations it is too artificial and unrealistic. We must look further into the character of the crime, and the manner of its perpetration [citation]. *When these do not reasonably create a fear of great bodily harm … there is no cause for the exaction of a human life.*" [Citations.]" (*Ceballos*, *supra*, 12 Cal.3d at p. 478, original italics.)

Section 197, subdivision 1 does not justify homicides committed when resisting attempts to commit all felonies, but only those committed when resisting atrocious crimes attempted to be committed by force. (*Ceballos*, *supra*, 12 Cal.3d at pp. 477-478; *Jones*, *supra*, 191 Cal.App.2d at p. 481.) More importantly, the defense applies only if the defendant possessed an honest and reasonable belief the victim was attempting to commit such a felony. (*Ceballas*, *supra*, 12 Cal.3d at p. 478; *Jones*, *supra*, 191 Cal.App.2d at p. 482; *Uriarte*, *supra*, 223 Cal.Ap.3d at p. 197.) "[A] person who honestly believes there is an imminent threat to his own life or the lives of others cannot harbor malice," (*Uriarte*, *supra*, at p. 197) but the "traditional common law doctrines of self-defense or defense of others which completely justify certain homicides" require the defendant's belief to be "both honest *and* reasonable." (*Ibid*., italics in original.) "In order to justify a homicide under these traditional principles, the defendant must have reason to believe that the danger is *imminent* and that lethal force is *necessary* to prevent death or great bodily injury. [Citations.]" (*Ibid*., italics in original.)

37.

The language of section 198 does not undermine this conclusion, even though it defines reasonableness in the context of the self-defense theories set forth in section 197, subdivisions 2 and 3. The reasonableness element of the defense defined in section 197, subdivision 1, was part of the original common law. If a statute is intended to modify a traditional common law rule, it must specifically so state. (*People v. Rossi* (1976) 18 Cal.3d 295, 299–300.) There is nothing in the language or history of section 198 that indicates a specific legislative intent to abrogate the common law reasonableness element of the felony-resistance defense. (*Ceballos*, *supra*, 12 Cal.3d at p. 478; *Jones*, *supra*, 191 Cal.App.2d at pp. 481–482; *People v. Hardin* (2000) 85 Cal.App.4th 625, 632–633.)

Defendant contends his characterization of section 197, subdivision 1, and the absence of reasonableness as a "limitation" on that aspect of perfect self-defense, has been recognized by other cases and in a prior version of a CALJIC instruction. However, defendant's characterization about section 197, subdivision 1 were rejected by the California Supreme Court in *Randle*, *supra*, 35 Cal.4th 987. In that case, the court addressed the existence and elements for imperfect self-defense of others. The Attorney General argued that such a theory did not exist. In making this argument, the Attorney General relied on an argument similar to the one raised by defendant in this case – that section 197, subdivision 1, did not expressly incorporate a reasonableness standard, whereas reasonableness is only required in the self-defense theories defined in section 197, subdivision 3 and section 198. (*Id.* at pp. 997–998.)

*Randle* held the theory of imperfect self-defense of others existed. In reaching that conclusion, it rejected the Attorney General's characterization of the self-defense theories in section 197:

> "A problem with the Attorney General's argument is that section 197 does not compartmentalize the doctrines of self-defense and defense of others as neatly as that. Subdivision 1, which the Attorney General characterizes as the defense-of-others provision, may also be read as including self-defense. No reason appears why the phrase 'any person,'

which occurs both in the stem of section 197 and in subdivision 1, would not cover oneself as well as others.  Under section 197, subdivision 1, a homicide is justifiable when committed by 'any person' 'resisting any attempt to murder *any person,* or to commit a felony, or to do some great bodily injury upon *any person.*'  (Italics added.)

"On the other hand, subdivision 3, which the Attorney General characterizes as the self-defense provision, also expressly covers the defense of others, albeit others in specified relationships with the person who comes to their defense.  Under this provision, a homicide is justifiable when committed by any person 'in the lawful defense of such person, *or of a wife or husband, parent, child, master, mistress, or servant of such person,* when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished....'  (§ 197, subd. 3, italics added.)

"Moreover, the Attorney General's argument – that the Legislature must have intended to adopt the alter ego rule for defense of others because it did not expressly incorporate a reasonable person standard in subdivision 1 – finds no support in the legislative history of section 197.

"Section 197, enacted in 1872, was based on the Crimes and Punishment Act of 1850.  Under the Crimes and Punishment Act, a reasonable person standard governed defense of others as well as self-defense.  Both of the defenses were covered by section 29.  'Justifiable homicide is the killing of a human being *in necessary self-defence, or in defence of habitation, property, or person,* against one who manifestly intends or endeavors, by violence or surprise, to commit a felony ....'  (Stats. 1850, ch. 99, § 29, p. 232, italics added.)  The applicability of the reasonable person standard to section 29 was made clear in the next section.  'A bare fear of any of these offences, to prevent which the homicide is alleged to have been committed, shall not be sufficient to justify the killing.  It must appear that the circumstances were sufficient to excite the fears of *a reasonable person,* and that the party killing really acted under the influence of those fears, and not in a spirit of revenge.'  (Stats. 1850, ch. 99, § 30, p. 232, italics added.)  *There is no reason to believe the Legislature, by enacting section 197, intended to substitute the alter ego standard for the reasonable person standard with regard to defense of others.*  To the contrary, the code commissioners noted: 'The commission has modified the language [of specified sections of the Crimes and Punishment Act of 1850], making it accord, in many respects, with that of the New York Penal Code [Field's Draft] §§ 260, 261, and 262. *The legal effect, however, has not been changed.*'  (Code commrs. note foll. Deering's Ann. Pen. Code,

§ 197 (1985 ed.) p. 163, italics added.)" (*Randle*, *supra*, 35 Cal.4th at pp. 998-999.)

We find *Randle* similarly rejects defendant's characterization of section 197, subdivision 1 as lacking a reasonableness standard, and are bound by the Supreme Court's interpretation of the defense. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) CALJIC No. 505 has been upheld as a correct statement of perfect self-defense/justifiable homicide. (*People v. Lopez* (2011) 199 Cal.App.4th 1297, 1306.) The jury in this case was correctly instructed with CALCRIM No. 505, and the instruction did not misstate the elements of perfect self-defense/justifiable homicide as provided in section 197, subdivision 1.

## II. <u>CALCRIM No. 3471</u>

Defendant next contends the jury was not properly instructed on his right, as an "original assailant" who used nondeadly force, to rely on perfect self-defense when Matthews escalated the confrontation by using deadly force. Defendant's instructional arguments are meritless.

### A. <u>Background</u>

Defendant's trial theory was that Matthews started the incident by showing his gun to defendant as Matthews walked into the store, Matthews drew and fired his gun first, and defendant pulled his own weapon and fired in self-defense. The prosecution's theory was that defendant began the incident by exchanging words with the three men when they arrived at the gas station, he escalated the situation by following them and calling out gang taunts when they left, he ignored Matthews's repeated statements that he did not want any trouble, and he fired the first shots at the three men, wounding Matthews and killing Small.

As relevant to these conflicting theories, the court instructed the jury with the following version of CALCRIM No. 3471, the pattern instruction on when an initial

aggressor may claim self-defense, also known as the "sudden and perilous" defense doctrine. (See, e.g., *People v. Ross* (2007) 155 Cal.App.4th 1033, 1046.)

> "A person who engages in mutual combat or *who is the initial aggressor* has a right to self-defense only if:
>
> "1. He actually and in good faith tries to stop fighting;
>
> "2. He indicates, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wants to stop fighting and that he has stopped fighting; and
>
> "3. He gives his opponent a chance to stop fighting.
>
> "If a person meets these requirements, he then had a right to self-defense if the opponent continues to fight.
>
> "If you decide that the defendant started the fight using non-deadly force and the opponent responded with such sudden and deadly force *that the defendant could not withdraw from the fight*, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting…." (Italics added.)

The jury also received CALCRIM No. 3472:

> "A person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force."

Defendant points to the last italicized phrase in CALCRIM No. 3471 – that he had the right to self-defense if he "could not *withdraw from the fight*" – and argues it misstates the law as to when and how an initial aggressor who used nondeadly force may claim perfect self-defense. Defendant asserts the italicized phrase should state that, as the aggressor who used nondeadly force, he could rely on self-defense if he "could not have *retreated in safety*" from the other party's use of deadly force. (Italics added.) Defendant argues the erroneous instruction violated his due process rights and requires reversal of his conviction.

**B. Analysis**

There is no evidence defendant objected to CALCRIM No. 3471 or requested modification of the instruction in any way. " 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.]  But that rule does not apply when … the trial court gives an instruction that is an incorrect statement of the law.  [Citations.]" (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011–1012; cf. *People v. Miceli* (1951) 101 Cal.App.2d 643, 648–649 [defendant asserting self-defense must request amplification where defense is based on "sudden and perilous" counter assault claim].)

In his opening brief, defendant did not address his failure to object to CALCRIM No. 3471.  In his reply brief, in response to the People's forfeiture argument, he belatedly contends the instruction is erroneous as a matter of law and, in the alternative, defense counsel was prejudicially ineffective for failing to object.  An appellate court ordinarily will not consider new issues raised for the first time in the defendant's reply brief. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764–765.)  Nevertheless, we will briefly address defendant's meritless claim.

In *People v. Hecker* (1895) 109 Cal. 451 (*Hecker*), the court stated the defendant was entitled to an instruction justifying a murder if the defendant "was put in such sudden jeopardy by the acts of deceased that *he could not withdraw ….*" (*Id.* at p. 461, italics added.)  This is the precise language used in CALCRIM No. 3471.  Later in *Hecker*, the court explained the same concept as follows:  "[I]t is the duty of the first wrongdoer before he can avail himself of the plea to have retreated to the wall, to have declined the strife and withdrawn from the difficulty, and to have killed his adversary, under necessity, actual or apparent, only after so doing.  If, however, the counter assault be so sudden and perilous that *no opportunity be given to decline or to make known to his adversary his willingness to decline the strife, if he cannot retreat with safety*, then as the

42.

greater wrong of the deadly assault is upon his opponent, he would be justified in slaying, forthwith, in self-defense. [Citations.]" (*Id*. at p. 464, italics added.)

The California Supreme Court clearly used the two "withdrawal" phrases interchangeably, it did not prefer one phrase to the detriment of the other phrase, and the language of CALCRIM NO. 3471 is not incorrect as a matter of law.

Defendant asserts the contrary holding was reached in *People v. Quach* (2004) 116 Cal.App.4th 294 (*Quach*), but that case dealt with a different situation. In *Quach*, the court addressed the correctness of former CALJIC No. 5.56, the predecessor to one part of CALCRIM No. 3471, about the availability of self-defense to participants in mutual combat. The instruction given in *Quach* did not contain any language about the defendant's inability to withdraw from the fight. In finding the former instruction erroneous, *Quach* cited to the latter definition given in *Hecker*, which had been quoted with approval in two other cases: " 'If, however, the counter assault be so sudden and perilous that no opportunity be given to decline or to make known to his adversary his willingness to decline the strife, if he cannot retreat with safety, then as the greater wrong of the deadly assault is upon his opponent, he would be justified in slaying, forthwith, in self-defense.' [Citation.]" (*Quach*, *supra*, 116 Cal.App.4th at pp. 301–302; see also *People v. Gleghorn* (1987) 193 Cal.App.3d 196, 201; *People v. Sawyer* (1967) 256 Cal.App.2d 66, 75.)

As a result of *Quach*, former CALJIC 5.56 was amended to read: "If the other party to the mutual combat responds in a sudden and deadly counterassault, that is, force that is excessive under the circumstance, the party victimized by the sudden excessive force *need not attempt to withdraw* and may use reasonably necessary force in self-defense." (Use Note to CALJIC No. 5.56 (Fall 2013 ed.) p. 341.) CALCRIM No. 3471 further refined this language, as quoted above, and consistent with the original definition provided in *Hecker* about when an original aggressor may rely on self-defense.

We find CALCRIM No. 3471 is not erroneous as a matter of law, the jury was properly instructed on defendant's right to self-defense, and defendant's due process rights were not violated.

## III. The accomplice instruction

As set forth in the factual statement, Quincy Brown testified as a prosecution witness. The prosecution also introduced evidence about Brown's pretrial statement to the police, which slightly differed from his trial testimony. The court granted defendant's request to give CALCRIM No. 334, the accomplice instruction, as to Brown; the prosecution did not join in the request.

Defendant now contends this instruction violated his due process rights and prevented the jury from considering the portions of Brown's pretrial statements and trial testimony which were favorable to the defense.

### A. Accomplices

Section 1111 states: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense;..." An accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (*Ibid.*)

"When a jury receives substantial evidence that a witness who has implicated the defendant was an accomplice, a trial court on its own motion must instruct it on the principles regarding accomplice testimony. [Citation.] This includes instructing the jury that an accomplice's testimony *implicating the defendant* must be viewed with caution and corroborated by other evidence. [Citations.]" (*People v. Houston* (2012) 54 Cal.4th 1186, 1223, italics added.) "Unless there can be no dispute concerning the evidence or the inferences to be drawn from the evidence, whether a witness is an accomplice is a question for the jury...." (*People v. Williams* (2008) 43 Cal.4th 584, 636.)

44.

## B. CALCRIM No. 334

The court granted defendant's request and instructed the jury with CALCRIM No. 334, as to the consideration of Quincy Brown's statements and trial testimony.  In relevant part, the pattern instruction stated:

> "Before you may consider the statement or testimony of Quincy Brown *as evidence against the defendant* in Count 1, 2, and 3, *you must decide whether Quincy Brown was an accomplice to any of those crimes*. A person is an accomplice if he or she is subject to prosecution for the identical crime charged against the defendant."  (Italics added.)

The instruction defined an accomplice, and the continued:

> "*If you decide that a witness was not an accomplice, then supporting evidence is not required and you should evaluate his statement or testimony as you would that of any other witness.  If you decide that a witness was an accomplice, then you may not convict the defendant of the crimes charged Counts 1, 2, 3 based on his statement or testimony alone*…."  (Italics added.)

The instruction also explained that the jury could use the statement or testimony of an accomplice to convict the defendant only if supported by other, independent evidence, which tends to connect defendant to the crimes, and need only be slight.  The instruction concluded:

> "*Any statement or testimony of an accomplice which tends to incriminate the defendant should be viewed with caution*.  You may not, however, arbitrarily disregard it.  You should give that statement or testimony the weight you think it deserves after examining it with care and caution, and in light of all the other evidence."  (Italics added.)

In closing argument, the prosecutor cited Brown's statements about what defendant said at the gas station as evidence of defendant's intent – that defendant told Brown he was " 'gonna kill this one, cause he showed me that gun.' "  Defense counsel argued Brown was an accomplice, and his statements which implicated defendant as the instigator of the incident were self-serving and made to avoid responsibility for the homicide.  Defense counsel also cited some of Brown's statements as supportive of

45.

defendant's self-defense theory.  In his rebuttal argument, the prosecutor disputed defense counsel's claim that Brown was an accomplice, and argued Brown's account of the incident and shooting was credible.

### C. **Analysis**

Defendant concedes that major portions of Brown's statements and trial testimony supported the People's case that defendant was guilty of murder.  Defendant further acknowledges that in such cases, the jury must be instructed to view the testimony of an accomplice with distrust.  However, defendant argues that some aspects of Brown's testimony supported the defense theory of self-defense and justifiable homicide.[18] Defendant thus concludes that given the favorable portions of Brown's testimony, the court should not have given the accomplice instruction that Brown's testimony required corroboration, because it raised a "fundamentally unfair barrier" to the jury's consideration of Brown's evidence in support of his self-defense theory.  Defendant contends the court should have instructed the jury about how to treat "those parts of an accomplice's testimony which supported the defense case .…"

First, defendant has failed to acknowledge that defense counsel requested the court to give the accomplice instruction, and that counsel did not request any modifications of

---

[18] Throughout this appeal, defendant asserts Brown gave evidence "favorable" to the defense because he "told the jury" that Terrell, Small, and Matthews were armed, that one of the men fired first, and that he never saw defendant firing his gun.  These characterizations are not entirely accurate.  At trial, Brown testified he never told the police that he knew all three men were armed; he never saw the three men with guns; he did not know if they had guns; and he assumed they might have been armed since they were probably in a gang.  Detective Ochoa testified about Brown's pretrial interview – Brown initially said he knew " 'for a fact that all three men were armed,' " he also went "back and forth" on that point, and he ultimately said, " 'I can't say that all three were armed.' "  Brown also told Detective Ochoa that he heard a gunshot; one of the three men had pulled his gun, that it was pointed at the ground and misfired; and defendant was already firing his gun before that man had even turned around.

the instruction. Defendant has necessarily forfeited review of this issue. (*People v. Riggs* (2008) 44 Cal.4th 248, 309.)

More importantly, however, defendant's attacks on the accomplice instruction have been addressed and rejected by the California Supreme Court. "[W]hen an accomplice is called to testify on behalf of the prosecution, the court must instruct the jurors that accomplice testimony should be viewed with distrust. [Citation.]" (*People v. Guiuan* (1998) 18 Cal.4th 558, 565 (*Guiuan*).) "[W]hen an accomplice is called by the defendant alone, it is error for the court to instruct the jurors sua sponte that it should view the testimony with distrust. [Citation.]" (*Id.* at pp. 567.) "The reason for the different rule when an accomplice is called by the defendant alone is evident: Because an accomplice does not ordinarily stand to benefit from providing testimony on behalf of the defendant, his or her statements are not necessarily suspect.… Indeed, a defendant will not ordinarily call an accomplice if the testimony is likely to be unfavorable." (*Ibid.*)

> "[W]hen an accomplice is called by both the prosecution and the defendant, the trial court should tailor the instruction to relate only to his testimony on behalf of the prosecution. [Citation.] [¶] Again, the reason for such a rule is clear. Although the testimony of an accomplice on behalf of the prosecution is subject to distrust because such witness has the motive, opportunity, and means to help himself at the defendant's expense, he or she ordinarily has no such motive, opportunity, or means when he testifies on behalf of the defendant." (*Ibid.*)

As examples of this last situation, the California Supreme Court cited *People v. Watson* (1952) 113 Cal.App.2d 799, where the prosecution and the defendant each called a different accomplice or possible accomplice. The defendant claimed that, because he had called an accomplice to testify on his behalf, the trial court erred in giving the standard instruction that accomplice testimony should be viewed with distrust. *Watson* "found no error, but only because the instruction, as given, was assertedly 'directed solely to prosecution witnesses whom the jury might find to be accomplices.' [Citations.]" (*Guiuan*, *supra*, 18 Cal.4th at pp. 567-568, citing *People v. Watson*, *supra*, 113

47.

Cal.App.3d at p. 803.) The court also cited to *People v. Williams* (1988) 45 Cal.3d 1268, which "applied the same rule when the accomplice was called both by the prosecution and by the defense. We held that the trial court erred by failing sua sponte 'to instruct the jurors that they should regard with distrust only [the accomplice's] testimony on behalf of the prosecution.' [Citation.]" (*Guiuan*, *supra*, 18 Cal.4th at p. 568, citing *People v. Williams*, *supra*, 45 Cal.3d at p. 1314.)

Based on these examples, *Guiuan* offered the following instructional guidance in situations similar to the instant case:

> "Whether the same, or a different, accomplice is called by both the prosecution and the defense, the rationale for requiring the trial court to modify the standard instruction remains the same: To the extent an accomplice testifies on behalf of the prosecution, the testimony is subject to the taint of an improper motive, i.e., that of promoting his or her own self interest by inculpating the defendant. To the extent such witness testifies on behalf of the defendant, the testimony is ordinarily subject to no such taint." (*Guiuan*, *supra*, 18 Cal.4th at p. 568, fn. omitted.)

To that end, *Guiuan* held "the instruction concerning accomplice testimony should henceforth refer only to testimony that *tends to incriminate the defendant*…." (*Guiuan*, *supra*, 18 Cal.4th at p. 569, italics added.)

In the instant case, the court correctly instructed the jury with CALCRIM No. 334 as to Quincy Brown's testimony, that it could not consider Brown's statements or testimony "*as evidence against the defendant*" unless it decided Brown was an accomplice; and if it decided Brown was an accomplice, it could not convict defendant based on Brown's testimony alone without supporting evidence. More importantly, the jury was instructed that if it decided Brown was not an accomplice, then "*supporting evidence is not required and you should evaluate his statement or testimony as you would that of any other witness*." (Italics added.) The jury was not told to view with caution Brown's testimony that might have been favorable to the defense. We presume the jury followed the instructions given. (*People v. Holt* (1997) 15 Cal.4th 619, 662.)

48.

## IV.  CALCRIM No. 337

O'Brian Matthews testified as a prosecution witness, and he was physically restrained in the courtroom.  Matthews admitted he had been charged with murder and other counts, that he had pleaded guilty to a gang charge, and that he was in prison.

Defendant contends the court erroneously instructed the jury with the following version of CALCRIM No. 337 about Matthews's appearance at trial:

> "When O'Brian Matthews testified, *he was physically restrained. Do not speculate about the reason.*  You must completely disregard this circumstance in deciding the issues in this case.  Do not consider it for any purpose or discuss it during your deliberations. *Evaluate the witness's testimony according to the instructions I have given you.*"  (Italics added.)

Defendant contends the first italicized phrase in this instruction violated his due process right to prevent a defense because "[i]n order for the jury to fairly evaluate the defense theory as to Matthews'[s] credibility, it was essential the jury discuss and consider exactly why he testified against [defendant] and what he stood to gain," but this instruction "fundamentally undercut" the defense because it prevented the jury from "properly assessing Matthews'[s] credibility and the defense presented[,]" and the likelihood the restraints led Matthews to "shade his testimony in the state's favor" and diminished his credibility.

An instruction is not considered in isolation, but in the context of the court's entire charge to the jury.  (*People v. Castillo* (1997) 16 Cal.4th 1009, 1016.)  To succeed on a claim of instructional error, a defendant must show that "there is 'a reasonable likelihood' the jury understood the instructions as the defendant asserts," considering "the specific language challenged, the instructions as a whole and the jury's findings.  [Citations.]" (*People v. Cain* (1995) 10 Cal.4th 1, 36.)

Defendant's instructional argument is meritless.  The instruction did not enhance Matthews's credibility, the jury was not told to disregard Matthews's custody status in assessing his credibility, and the jury could not have reasonably interpreted CALCRIM

No. 337 to require that. Instead, the court instructed the jury that the fact of restraints did not *by itself* make Matthews more or less believable, and that the jury should evaluate his testimony "*according to the instructions I have given you.*" The jury also received CALCRIM No. 226, which listed several factors to evaluate the credibility of a witness, including the witness's bias or personal interest in the result, and whether the witness had been convicted of a felony or engaged in other conduct reflecting on the witness's believability. CALCRIM No. 316 separately addressed a witness's commission of a felony or other misconduct. The entirety of the instructions allowed the jury to fully evaluate Matthews's credibility. No reasonable juror would have misconstrued CALCRIM No. 337 to prohibit or discourage any inference that Matthews's custodial status provided him with a reason to falsely testify in favor of the prosecution, and the instruction's neutral language did not violate defendant's due process rights.

## V.  Voluntary manslaughter

Defendant raises one issue as to his second trial, which resulted in his conviction for the second degree murder of his wife, Tiffany. At trial, defendant's defense was that Tiffany committed suicide. On appeal, defendant contends the court had a sua sponte duty to instruct the jury on voluntary manslaughter as a lesser included offense of murder, even though he did not rely on that defense, because there was evidence that he killed Tiffany in the heat of passion based on their arguments about her alleged infidelity. This argument is meritless.

### A.  The court's sua sponte duty to instruct

"A court must instruct sua sponte on general principles of law that are closely and openly connected with the facts presented at trial. [Citations.] This sua sponte obligation extends to lesser included offenses if the evidence 'raises a question as to whether all of the elements of the charged offense are present and there is evidence that would justify a conviction of such a lesser offense. [Citations.]' [Citations.]" (*People v. Lopez* (1998) 19 Cal.4th 282, 287–288.)

The court has a sua sponte duty to instruct on a lesser included offense even if it is inconsistent with the accused's theory of the case, and the defendant expressly objects to the instruction as a matter of trial tactics. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1345; *People v. Breverman* (1998) 19 Cal.4th 142, 154–155.)

However, when the evidence is minimal and insubstantial, there is no duty to instruct. (*People v. Barton* (1995) 12 Cal.4th 186, 196, fn. 5.) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is ' "evidence from which a jury composed of reasonable [persons] could ... conclude[]" ' that the lesser offense, but not the greater, was committed. [Citations.]" (*People v. Breverman*, *supra*, 19 Cal.4th at p. 162, italics in original.)

On appeal, we independently review the question of whether the court failed to instruct on a lesser included offense. (*People v. Cole* (2004) 33 Cal.4th 1158, 1215 (*Cole*).)

In this case, defendant was charged with murdering Tiffany. After the parties rested, the court discussed possible lesser included offenses with the prosecutor and defense counsel. Both parties agreed the evidence did not support instructions on any lesser included offenses. The prosecution argued defendant was guilty of second degree murder. Defendant relied on the theory that Tiffany committed suicide and he was not guilty of any offense. Defendant was convicted of second degree murder.

Defendant now contends the evidence would have supported an instruction on the lesser included offense of voluntary manslaughter based on heat of passion/provocation. Voluntary manslaughter is a lesser included offense of murder. (*People v. Rios* (2000) 23 Cal.4th 450, 461.) If there was substantial evidence to support an instruction on voluntary manslaughter as a lesser included offense, the court had a sua sponte duty to

51.

give that instruction, even though it was inconsistent with his defense, and defendant did not forfeit or waive the issue by failing to request the instruction. The crucial question, however, is whether the evidence even supported voluntary manslaughter instructions based on the unique facts of this case.

## B. <u>Voluntary manslaughter</u>

Defendant asserts there was substantial evidence to support a lesser included instruction on voluntary manslaughter based on "the unlawful killing of a human being without malice aforethought 'upon a sudden quarrel or heat of passion.' [Citation.]" (*Cole*, *supra*, 33 Cal.4th at p. 1215.) "Heat of passion arises when 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' [Citations.]" (*People v. Barton*, *supra*, 12 Cal.4th at pp. 201–202.)

"The heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively. '[T]his heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances,' because 'no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.' [Citation.]" (*People v. Steele* (2002) 27 Cal.4th 1230, 1252–1253.)

"[T]he factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim.

[Citations.] The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]" (*People v. Lee* (1999) 20 Cal.4th 47, 59.) "Although the provocative conduct may be verbal,… such provocation 'must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment.' [Citation.]" (*People v. Manriquez* (2005) 37 Cal.4th 547, 586.)

In addition, "the killing must be 'upon a sudden quarrel or heat of passion' [citation]; that is, 'suddenly as a response to the provocation, *and not belatedly as revenge or punishment*. Hence, the rule is that, if sufficient time has elapsed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter.' [Citation.]" (*People v. Daniels* (1991) 52 Cal.3d 815, 868, italics added.)

"In sum, where there is no substantial evidence of sufficient provocation that would arouse a passion in an ordinarily reasonable person or evidence of sufficient time for that passion to subside in a reasonable person, the court need not give a requested instruction on voluntary manslaughter. [Citations.]" (*People v. Kanawyer* (2003) 113 Cal.App.4th 1233, 1245.)

### C. <u>Analysis</u>

Defendant argues there was substantial evidence to trigger the court's sua sponte duty to instruct on voluntary manslaughter/heat of passion, based on the "long history of arguments" about Tiffany's alleged infidelity. Defendant cites the letters between defendant and Tiffany showing the "long history of jealousy," and defendant's belief that she was unfaithful. As further evidence in support of heat of passion, defendant cites the police call to their house about a week before the homicide, when defendant said they were fighting over allegations of Tiffany's infidelity, and the testimony from S., Tiffany's daughter, about the argument the night before the homicide.

Defendant asserts the prosecutor essentially acknowledged there was evidence of defendant's heat of passion, based on the prosecutor's closing argument that defendant was jealous of Tiffany "over a long period of time" and the homicide occurred after they argued about whether she was faithful to him. As defendant acknowledges, however, the prosecutor's argument focused on this evidence as indicative of defendant's motive – "[o]bviously it's jealousy …. That's what drove [defendant] to kill Tiffany …." The prosecutor argued defendant "did love her to death" and he was not able to "control his jealousy and his anger[.]"

Defendant thus contends:

> "The same evidence on which the prosecutor himself relied to charge only second degree murder – evidence of jealousy over a long period of time involving allegations of infidelity – supported instructions on the lesser included offense of voluntary manslaughter…."

Defendant's summary of the evidence and argument is fairly accurate, but ignores the absence of provocation. The prosecution's case demonstrated that defendant was obsessed with Tiffany's alleged infidelity, based on the lengthy exchange of letters in 2005. In these letters, defendant refused to accept Tiffany's declarations and assurances of faithfulness. Instead, he repeatedly justified his prior physical abuse of her, declared his certainty that she was sleeping with numerous men in his absence, and threatened further harm if she did not obey or talk correctly to him.

More chillingly, defendant declared he was "gonna drown you in the pool big time[]" if he discovered other men visited the house in his absence. As if to eliminate any doubt about his intentions, he wrote in another letter that he would beat Tiffany if he found out that "Daniel" had been in the house, and she would be "like (Lacey Peterson)" because "I don't care about going to jail,… I'll go on the run first until they catch me, so don't tempt me or go there. That's a promise.… 'I don't care if you're scared of dying or not cause that will make my job easier.…' "

54.

While there was evidence of arguments after defendant returned to the household, the entirety of the record demonstrates those arguments were simply continuations of the accusations and death threats that defendant had delivered, without interruption, in the months leading to the homicide. Tiffany's daughter testified about the situation in the bedroom the night before Tiffany's body was found, and described defendant yelling and Tiffany crying. However, S. never offered any testimony that supported evidence of Tiffany's purported provocation.

As explained *ante*, a killing upon a sudden quarrel or heat of passion must occur " 'suddenly as a response to the provocation, *and not belatedly as revenge or punishment*….' [Citation.]" (*People v. Daniels, supra,* 52 Cal.3d at p. 868, italics added.) Contrary to defendant's arguments, extreme jealousy and preoccupation with someone's possible infidelity are insufficient to support instructions on voluntary manslaughter based on heat of passion. (*People v. Hyde* (1985) 166 Cal.App.3d 463, 473.) "It is important … to distinguish between jealousy as a motive for the killing and jealousy sufficient to invoke the 'heat of passion' concept…." (*Ibid*.) A defendant's jealousy of another person's alleged relationship with a third person, "in and of itself, is insufficient to allow a reasonable jury to conclude" that a killing was committed in the heat of passion. (*Ibid*.) "In order to warrant the giving of a voluntary manslaughter instruction, the evidence of defendant's jealousy must be such as to suggest he did not either intend to kill or act in conscious disregard of a substantial probability that death would result. Furthermore, defendant's 'passion' must be the result of 'sufficient provocation.' [Citations.]" (*Ibid*.)

Aside from his unshakeable jealously, there was no evidence that Tiffany engaged in any provocative conduct to warrant instructions for heat of passion/voluntary manslaughter. (See, e.g. *People v. Lujan* (2001) 92 Cal.App.4th 1389, 1413–1413; *People v. Bufarale* (1961) 193 Cal.App.2d 551, 562.) For example, in *People v. Cole, supra,* 33 Cal.4th 1158, the defendant was convicted of first degree murder after he killed

the victim by breaking into her house at night, pouring gasoline on her as she slept, and setting her on fire. The victim had been his girlfriend for five years, and they had shared an apartment. At the time of the killing, the defendant was intoxicated and believed the victim was cheating on him. The victim lived long enough to tell the police that the defendant was extremely jealous of her, that he had followed her around all day, that he thought she was cheating on him, and that they had argued earlier that evening. (*Id*. at pp. 1172–1173.) The defendant told police that just prior to the killing, the victim cursed him, and he went " 'berserk' " because she threatened to use a butcher knife against him. (*Id.* at p. 1173.) At trial, the defendant testified he killed the victim after an argument in which she told him that if he fell asleep, she would disfigure his body with a butcher knife. (*Id.* at p. 1176.)

*Cole* held this evidence did not support giving a voluntary manslaughter instruction:

> "While defendant and [the victim] had argued, [the victim] was in bed when defendant began his physical assault by pouring gasoline on her. Furthermore, between defendant and [the victim], bickering, yelling, and cursing were the norm. Their conduct that evening apparently was no different than the many other occasions on which they had argued in their five-year relationship. Neither was defendant's drinking on the day of the fire different [from] any other day. Accordingly, the trial court did not err in failing to instruct on voluntary manslaughter based on heat of passion." (*Cole, supra,* 33 Cal.4th at p. 1216.)

In this case, as in *Cole*, there was insufficient evidence to establish heat of passion or provocation sufficient to support voluntary manslaughter instructions. In addition, the prosecutor did not argue there was evidence of provocation or heat of passion, and instead cited defendant's jealousy as the motive for the murder.

In any event, if a trial court fails to instruct on a lesser included offense that is supported by the evidence, the error does not require reversal unless "an examination of the entire record establishes a reasonable probability that the error affected the outcome.

[Citations.]" (*People v. Breverman, supra,* 19 Cal.4th at p. 165; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Even if there had been enough to merit an instruction on heat of passion, the evidence fell fall short of creating a reasonable probability that the failure to instruct was prejudicial.

## VI. The court's security decisions

Defendant's final issue is addressed to both trials. He contends the court abused its discretion at both trials when it ordered additional deputies to provide security in the courtrooms in lieu of shackling. Defendant argues there was no evidence he was a disruptive inmate or posed a security risk, the presence of additional deputies was prejudicial, and he speculates that he might have been shackled at one or both trials in violation of his due process rights.

### A. The court's discretion on security issues

"Many courtroom security procedures are routine and do not impinge on a defendant's ability to present a defense or enjoy the presumption of innocence. [Citation.] However, some security practices inordinately risk prejudice to a defendant's right to a fair trial and must be justified by a higher showing of need. For example, visible physical restraints like handcuffs or leg irons may erode the presumption of innocence because they suggest to the jury that the defendant is a dangerous person who must be separated from the rest of the community. [Citations.] Because physical restraints carry such risks, their use is considered inherently prejudicial and must be justified by a particularized showing of manifest need. [Citations.]" (*People v. Hernandez* (2011) 51 Cal.4th 733, 741–742.)

In contrast, a security officer's presence next to a testifying defendant at the witness stand is not "inherently prejudicial" and does not constitute a " 'human shackle.' " (*People v. Stevens* (2009) 47 Cal.4th 625, 636, 638.) "[S]o long as the deputy maintains a respectful distance from the defendant and does not behave in a manner that distracts from, or appears to comment on, the defendant's testimony, a court's decision to

57.

permit a deputy's presence near the defendant at the witness stand is consistent with the decorum of courtroom proceedings." (*Id.* at p. 639, fn. omitted.)

While such a practice may not be "inherently prejudicial," the court has cautioned that "the trial court must exercise its own discretion in ordering such a procedure and may not simply defer to a generic policy." (*People v. Stevens, supra,* 47 Cal.4th at p. 644.) "The court may not defer decisionmaking authority to law enforcement officers, but must exercise its own discretion to determine whether a given security measure is appropriate on a case-by-case basis. [Citations.] [T]he trial court has the first responsibility of balancing the need for heightened security against the risk that additional precautions will prejudice the accused in the eyes of the jury. 'It is that judicial reconciliation of the competing interests of the person standing trial and of the state providing for the security of the community that, according to [Supreme Court precedent], provides the appropriate guarantee of fundamental fairness.' [Citation.] The trial court should state its reasons for stationing a guard at or near the witness stand and explain on the record why the need for this security measure outweighs potential prejudice to the testifying defendant. In addition, although we impose no sua sponte duty for it to do so, the court should consider, upon request, giving a cautionary instruction, either at the time of the defendant's testimony or with closing instructions, telling the jury to disregard security measures related to the defendant's custodial status. [Citation.]" (*Id.* at p. 642.)

The court's decision to employ security measures in the courtroom are reviewed for an abuse of discretion. (*People v. Hernandez, supra*, 51 Cal.4th at p. 741.)

With these guidelines in mind, we turn to defendant's claim of error.

**B. Defendant's arrests**

As explained *ante*, defendant was not immediately arrested after the shooting at the Chevron station, which occurred on March 18, 2005. At 6:00 a.m. on March 23, 2005, police officers arrived at an apartment complex where they believed defendant was

living.  The officers approached the front door and gave knock/notice.  They heard people inside the apartment but no one responded.  After a standoff of several hours with a SWAT team and negotiators, defendant emerged at 1:00 p.m., and he was arrested.

Defendant was apparently released from custody and living with Tiffany in October 2005.  On November 1, 2005, Tiffany's body was found in their house.  On November 4, 2005, officers found defendant as he walked away from a motel near Highway 99 and Belmont.  Defendant refused to surrender and ran away at a full sprint.  As an officer pursued him and ordered him to stop, defendant jumped a fence and ran through a plate glass window.  He tried to run through another window but the glass wouldn't break, and he was forced to surrender.

## C. The court's security findings at the first trial

As explained *ante*, defendant was initially charged with (1) first degree murder of Small and the attempted murder of Matthews at the Chevron station, (2) second degree murder of Tiffany, and (3) two gang-related murders which occurred in 1998.  The court granted defendant's severance motion for separate trials in the three murder cases.  He was initially tried in the Chevron case, and then separately tried for the murder of Tiffany.  Judge Hamlin presided over both cases.[19]

On October 7, 2009, defendant's trial began for the gas station murder, and the court heard motions in limine.  Defense counsel asked the court to address whether defendant had to be shackled.  The court replied that it had asked the sheriff's department whether there were any issues about restraining defendant, and ordered the department to respond by the next day.

On October 8, 2009, the court addressed the shackling issue.  The court decided to have two bailiffs in the courtroom during the trial instead of physically restraining

---

[19] The probation report states that at the time of sentencing in this case, the 1998 murder charges were still pending against defendant.

defendant. The court stated the sheriff's department had "no showing to make about *dangerousness on [defendant's] behalf. He's posed no problems to them in the jail,* so their view is apparently that they don't need to be heard on that question of shackling,…" (Italics added.)

However, the court found that "*somebody who is looking at a number of potential life terms certainly poses some flight risk*, and if [defendant] chooses to be totally unrestrained, untethered, then I would expect the minimum of two deputy sheriffs to ensure safety in the courtroom, and to ensure that he does not flee. I don't see any reason for them to have more than two, but *case law says there is no need for a showing – manifest need in order to justify increased numbers of security personnel in the courtroom as there would be in order to justify shackling, so I would suggest that commonly persons in [defendant's] position would request a silent, invisible tether at their feet, which would minimize the need for additional security* because even though case law doesn't say there's a need, doesn't make a showing or manifest need to justify additional deputies,…" (Italics added.)

The court believed that if there were three or more deputies standing around defendant, he would appear "to be a menacing defendant, so he has the option, the silent tether at his feet to be screened from view by the jurors to achieve that goal…." The court stated that defendant and counsel could be seated in such a way to provide appropriate screening from the jury.

The court further found that "[i]f there are investigating officers present, if that's the case, I'd expect throughout the trial *there would be a single deputy present*, and in the event that [defendant] chooses to testify in the case, he would then be completely untethered, he'd be able to stand, raise his hand, and take an oath, like any other witness, and walk to the witness stand. The jurors would at no time be aware he was restrained, and during that portion of the proceedings totally unrestrained. That is an option you may discuss with [defendant], *otherwise I'd expect that given the nature of these charges,*

*including the gang allegations that there would be a reasonable expectation of the Court for the safety of its own personnel as well as the public and for security that [defendant] doesn't flee, I would expect at least two deputies then present throughout the proceedings.* I assume that's what the sheriff would have in mind as well…." (Italics added.)

The court asked defense counsel to discuss the matter with defendant, and she said she would. There was no further discussion of this matter on the record.

After the jury was selected and sworn, the court advised the jury it that it would see certain personnel in the courtroom during the trial, including the regularly assigned deputy, and a second deputy who would change from day to day. "That's standard procedure. We have two deputies throughout the trial, but only one is permanently assigned. That allows flexibility for the sheriff to rotate others in and out." Defendant did not object and the matter was not again addressed. Defendant did not testify.

On November 3, 2009, defendant was convicted of count I, first degree murder of Small; count II, attempted murder of Matthews; and count III, active participation in a criminal street gang.

### D. The trial for the murder of Tiffany

On July 20, 2010, defendant's separate trial began for the murder of Tiffany. The minute order states that two bailiffs were present during the initial day of jury selection. The minute orders for the following dates only identify one bailiff. On July 26, 2010, the court granted defendant's motion for a mistrial.

On February 7, 2011, defendant's retrial began for the murder of Tiffany. There is no evidence that the court and the parties discussed security, tethering, or the number of bailiffs. The minute orders only identify one bailiff in the courtroom. Defendant did not testify. He was convicted of second degree murder and assault with a firearm.

## E. Analysis

Based on this record, defendant contends his murder convictions in both cases must be reversed because the court gave no "case-specific reasons" to increase security, that it forced defendant to make a choice between shackling and multiple deputies, that the presence of multiple deputies implied to the jury that defendant was a dangerous man in the first trial, and that he was not "an innocent, grieving husband" in the second trial. Defendant even speculates that he might have been physically restrained and tethered in one or both trials, without any citations to the record in support of this assertion.

Defendant's arguments are meritless based on the record before this court. The trial court did not abuse its discretion by ordering an additional bailiff to be in the courtroom. When officers tried to arrest him for the gang shooting, defendant refused to surrender when ordered to do so, and a lengthy standoff ensured between defendant and a SWAT team before defendant finally emerged from his apartment. When officers tried to arrest him for the murder of Tiffany, he broke into a sprint, jumped fences, crashed through a plate glass window, and tried to crash through another window before he was forced to surrender. Defendant had been charged in three separate murder cases: the gas station murder of Small, the murder of Tiffany, and the gang-related murders in 1998. He was facing multiple life terms for the murders, his prior convictions, and the firearm allegations. The court's concerns about security were justified and supported by the record.

In the first trial, the court advised the jury that it was common practice to have a second deputy rotate through the courtroom. There is no evidence the second deputy stood or sat next to defendant or the defense table. As for the trial on Tiffany's murder, the minute orders reflect that only one bailiff was present in the courtroom. In addition, there is absolutely no evidence that defendant was shackled, tethered, or physically restrained in any way. Defendant's speculation that he might have been physically

restrained is interesting since he alone would know if such restraints were used during one or both trials.

## **DISPOSITION**

The judgments are affirmed.


_____
Poochigian, J.

WE CONCUR:


_____
Gomes, Acting P.J.


_____
Franson, J.